[No. 21759-7-II.    Division Two.    November 20, 1998.]

CONCERNED RATEPAYERS ASSOCIATION, *Appellant*, v. PUBLIC UTILITY DISTRICT NO. 1 OF CLARK COUNTY, WASHINGTON, *Respondent.*

*John S. Karpinski*, for appellant.

*James E. Lobsenz* of *Carney, Badley, Smith & Spellman,* for respondent.

SEINFELD, J. — The Concerned Ratepayers Association (CRA) brought this Public Disclosure Act lawsuit against the Public Utility District No. 1 of Clark County (the District). The CRA sought a General Electric document containing the technical specifications for a turbine generator. It also sought the financial records relating to a proposed power plant.

The trial court dismissed the action, implicitly concluding that the specifications document was not a public record and that all financial records had been disclosed. Because the evidence does not show that the District prepared, owned, used, or retained the specifications document, and because it further shows that the District disclosed all financial records in its possession, we affirm.

## FACTS

CRA, acting through its members Robert Wachter and Betty Smith, sought a public vote on the District's plans to construct the River Road Generating Plant. Because RCW 80.52.040[1] requires voter approval before a public agency may sell bonds to finance the construction of a public

---

[1]RCW 80.52.040 provides:

No public agency or assignee of a public agency may issue or sell bonds to finance the cost of construction or the cost of acquisition of a major public energy project, or any portion thereof, unless it has first obtained authority for the expenditure of the funds to be raised by the sale of such bonds for that project at an election conducted in the manner provided in this chapter.

energy project capable of generating more than 250 megawatts of electricity, CRA sought information that might show the project turbine's generating capacity.

In particular, CRA wanted a copy of a document referred to as IPS-10380, dated April 1994, that allegedly contained technical specifications for a gas-fired turbine generator, referred to as General Electric Model MS7231FA. General Electric, a subcontractor, apparently owned the document. CRA believed that the District used the IPS specifications in reviewing contract bids for the project and/or in designing the River Road Plant generator. CRA also wanted all financial records for the project.

Wachter and Smith began requesting information about the turbine in early 1995.[2] On April 20, 1995, and again on June 21, Wachter wrote to the District requesting IPS-10380. The District sold Smith a copy of a document that appeared to contain the technical information she and Wachter had requested. But there was a blank page under the caption "12.2 TURBINE-GENERATOR (GE) SCOPE OF SUPPLY."

In a June 30 response to Wachter's June 21 letter, the District said that it had provided 115 pages of detailed bid and engineering specifications for the turbine components and that this material represented "all of the technical data necessary for the project at this time." The response also stated that the "remaining level of engineering details will be included in the procedures manual" that the general contractor, Cogentrix, Inc., was preparing and that the District would provide Wachter with a copy of the "GE quotation dated April 1994 when we receive it." The exchange of letters continued with CRA repeatedly requesting more financial and technical data and the District responding with some information and promises of more in the future.

---

RCW 80.52.030(2) defines "major public energy project" as "a plant or installation capable, or intended to be capable, of generating electricity in an amount greater than [250] megawatts."

[2]Betty Smith and her husband did not form Concerned Ratepayers until June 1995.

Finally, on February 24, 1996, CRA wrote another letter[3] formally requesting the River Road Plant's specifications pursuant to the Public Disclosure Act, RCW 42.17. Counsel for the District, Wayne Nelson, responded as follows:

While our engineering department, the Utilities consulting engineers and Cogentrix engineers have seen and carefully evaluated most if not all of the technical data in the possession of GE regarding the turbine, much of the technical information has been protected by GE through a claim of proprietary information, i.e. the information is confidential.

. . . I'm sure you can appreciate the fact that millions of dollars of engineering and design work go into the production of the equipment which will make up the power island of the project. Competitors of GE would certainly appreciate the benefit of being provided that information at no cost to them. The blanket request you have made causes GE to question the motive behind the request.

Based on those practical considerations, GE has chosen not to provide the Utility or Cogentrix with certain information regarding the turbine which would fall within the request contained in your letter of February 24, 1996. Certain information which GE has provided Cogentrix has been marked "confidential and proprietary". As these are documents the Utility does not possess, nor has any right to demand possession, they are not subject to a request under the public disclosure laws.

. . . .

. . . [I]n an attempt to accommodate your request, the Utility is attempting to convince GE to allow you access to documents which they feel will not unduly prejudice their market position. . . .

It is our belief that GE will be willing to meet with you personally to review the documents they are comfortable in providing. It would be extremely helpful if you could identify specifically what information it is you would like to review. Representatives of GE would undoubtedly be better able to at-

---

[3]This letter did not mention the CRA's previous requests for financial information.

tempt in good faith to provide you with the information you are looking for.

According to Nelson, CRA did not respond to his letter. Instead, in May 1996 it filed this lawsuit. The District answered with a claim that it had made available all documents in its possession regarding General Electric's specifications for the gas-fired turbine, including the entire procedures manual for the Project. The District said that it had been willing to ask General Electric for other documents in General Electric's possession, provided CRA specifically identified what it wanted. The District also denied that it deleted or removed anything from the documents that it provided to Smith.

The trial court decided this matter solely on documentary evidence. From that evidence, we derive the following description of events in the development of the River Road Project.

In 1994, the District contracted with Economic and Engineering Services, Inc. (E&ES) for assistance in evaluating contractor bids for the construction of the Project. In September 1994, Cogentrix presented the District with a proposal that indicated the use of a General Electric gas turbine. On October 6, Cogentrix submitted an updated proposal that indicated several attachments. Those included "(GE) gas turbine, steam turbine and generator scope document number IPS-10380 (0494)." But according to Gary Saleba, the senior vice president of E&ES, the IPS-10380 document was not included.

Sometime that fall, James Sanders, the District's technical director, along with E&ES representatives, were present at Cogentrix's headquarters in Charlotte, North Carolina, during Cogentrix's contract negotiations with General Electric. According to Sanders,

> They had portions of the proposal there that they were reviewing and passing around the table. That's before the contract between GE and Cogentrix was entered into. And at that time we all saw that, and every page that had anything to do with the combustion turbine was stamped "proprietary" by GE.

Sanders also said that he "didn't exactly know what I was . . . going through—it was a negotiation with General Electric, between Cogentrix and General Electric, on the contract for the turbine and the kinds of guarantees that they could put forth . . . so that we could put the plant together in the way that we'd specified in the project procedures manual."

On December 8, 1994, the District and Cogentrix signed two agreements: one for developing and engineering the Project and one for procurement and construction. Exhibit A to the development agreement states: "The combustion turbine package includes a General Electric Model MS7231FA . . . gas turbine . . . . The combustion turbine is more fully defined in General Electric proposal number IPS-10380 dated April, 1994." Both agreements provide that "the Project will be designed and constructed so that the Project will be incapable of generating electricity in excess of two hundred forty-eight (248) megawatts."

Saleba contended that the District was not overly concerned with the details of the specifications because it was relying on the $20 million performance guarantee provided for in the development agreement. According to Saleba,

> [t]he IPS-10380 document became relatively unimportant to [the District] as the contract evolved from a "specifications" based contract to a "performance" based contract. Under the existing "performance" based contract with Cogentrix, the generation facility is guaranteed to meet certain standards. If not met, the guarantee is backed up by a twenty million dollar letter of credit.

According to Sanders,

> [t]he reason various documents refer to IPS-10380 is that was the GE number for a generic Power Island proposal to Cogentrix for use is [sic] responding to [the District's] request for proposals. Specifications for the unique Power Island used for the River Road Generating Project were developed via the negotiation of the Project Procedures Manual.
>
> . . . .

The Power Island specified in IPS-10380 *would not contain the final specifications* for the Power Island *used* in the River Road Generating Project. The specifications for the Power Island used in the River Road Generating Project are the result of negotiations between GE and Cogentrix in order to meet the performance specifications guaranteed under the contract between Cogentrix and [the District]. To the extent [the District] needed, has been in possession of, or has used for any purpose portions of IPS-10380, those documents have been provided to Mr. Wachter and Ms. Smith.

(Emphasis added.)

In April 1995, Smith wrote to the Energy Facility Site Evaluation Council (the Council) seeking its determination as to whether the Project turbine would exceed the megawatt statutory threshold. The Council examined the question with the assistance of a state professional engineer and concluded that

neither the written materials currently available nor the public presentations at [the Council's June 12, 1995] meeting provided a basis to conclude that the planned project will exceed [the Council's] jurisdictional threshold as specified in either current state law, or in the new language that will go into effect in July.

Apparently the Council continued to consider the matter further because in July, Sanders wrote the Council that

the District has provided the citizens with all the information that it has available. Cogentrix is currently developing and finalizing the specifications for the facility and will provide them to [the District] once they are completed. At that time [the District] will provide the citizens with a copy. These citizens have been advised that this is the case but nevertheless continue to infer that [the District] is refusing to provide this documentation. The relevant sections of GE quotation #IPS-10380 were provided to Ms. Smith on June 9 and Mr. Wachter referred to the information in his July 10 remarks before the council.

In early 1996, the District stated a second reason for not

releasing the specifications. At a January 1996 Board of Commissioner's meeting, the District indicated that it could not make the technical specifications public because General Electric had marked them as "proprietary information."

After reviewing the above evidence, the trial court found "[c]onfusion is substantial as to what part IPS 10380 played in the development of the plans of the original or new power plant. [The District] has the burden by 'preponderance' to show that IPS 10380 was not 'used' or 'retained.'" The court concluded that the District had not met this burden as to IPS-10380. It did, however, allow the District 30 days either to "disclose any and all parts of IPS 10380 not previously disclosed that were received, viewed, used and/or retained in any way to develop the original or subsequent plans for the power plant" or to "provide an affidavit from its manager and from E&ES . . . verify[ing] that all documents received, viewed, used and/or retained by [the District] or E&ES to develop the original and new plans for the power plant have previously been disclosed, including IPS 10380."

The District's chief executive officer, Bruce Bosch, responded with an affidavit that stated, in pertinent part:

> The contracts which the [District] has executed with Cogentrix are "performance based" contracts. . . .
>
> The contracts with Cogentrix specifically require that the generation facility be designed and constructed so as to be incapable of producing in excess of 248 megawatts of electricity. . . .
>
> . . . [A]ll the documentation including those portions of IPS 10380 which was viewed, used *and/or* retained by [the District] and [E&ES] in order to develop the original and new plans for the power plant, have all been disclosed to the plaintiffs in this action.

(Emphasis added.)

Saleba of E&ES also submitted an affidavit. He said that

I along with attorney Terry Mundon was in charge of negotiat-

ing contract principles with Cogentrix on behalf of [the District] for the construction of a gas powered electrical generation plant.

I also oversaw the negotiations over the Project and Procedures Manual which was developed pursuant to the contracts between Cogentrix and [the District].

I have personally determined that all the documentation including those portions of IPS 10380 which was viewed, used *and/or* retained by [the District and E&ES] in order to develop the original and new plans for the power plant, have all been disclosed to the plaintiffs . . . .

(Emphasis added.)

CRA objected to the use of the phrase "used *and/or* retained" in Saleba's and Bosch's affidavits as inconsistent with RCW 42:17.020(36), which states "used, *or* retained." The trial court then asked the District to provide affidavits indicating whether it disclosed all documents it "prepared, owned, used *or* retained" and all budget and financial records pertaining to the Project.

Saleba and Bosch produced additional affidavits indicating that they had provided all documentation "prepared, owned, used *or* retained" and that all financial documentation requested by CRA had been produced. The trial court then dismissed the case. CRA appeals.

## DISCUSSION

### I. STANDARD OF REVIEW

██ Trial courts review de novo agency actions challenged under the Public Records Act. RCW 42.17.340(3); *Progressive Animal Welfare Soc'y (PAWS) v. University of Wash.*, 125 Wn.2d 243, 252, 884 P.2d 592 (1994). Where the record consists of only affidavits, memoranda of law, and other documentary evidence, appellate courts sit in the same position as the trial court. *PAWS*, 125 Wn.2d at 252 (citing *Spokane Police Guild v. Liquor Control Bd.*, 112 Wn.2d 30, 35-36, 769 P.2d 283 (1989)).

Here, the record contains no testimonial evidence, and thus our review is de novo.

## II. THE PUBLIC RECORDS ACT

■ The public records portion of the Public Disclosure Act (the Act) requires that "[e]ach agency . . . shall make available for public inspection and copying all public records" unless the record falls within certain very specific exemptions. RCW 42.17.260; *PAWS*, 125 Wn.2d at 250. The purpose of the Act is to preserve the sovereignty of the people over the agencies that serve them. RCW 42.17.251; *PAWS*, 125 Wn.2d at 251. To promote this purpose, we liberally construe the Act's disclosure provisions and narrowly construe its exemptions. RCW 42.17.010(11); 42.17.251; 42.17.290; *PAWS*, 125 Wn.2d at 251. Further, "[t]he agency has the burden of establishing that disclosure of requested records is not required." *Tacoma News, Inc. v. Tacoma-Pierce County Health Dept.*, 55 Wn. App. 515, 519, 778 P.2d 1066 (1989); *Amren v. City of Kalama*, 131 Wn.2d 25, 32, 929 P.2d 389 (1997); *PAWS*, 125 Wn.2d at 251; RCW 42.17.340(1).

### A. IPS-10380

Here, the District did not claim below that the IPS specifications were statutorily exempt from disclosure.[4] Rather, the District asserted that the specifications did not fall within the Act's definition of a public record because the District did not possess them.

■ The Act defines a public record as follows:

[A]ny writing containing information relating to the conduct of government or the performance of any governmental or proprietary function prepared, owned, *used*, or retained by any state or local agency regardless of physical form or characteristics.

---

[4]Nonetheless, the District on appeal notes that "if [it] had ever obtained a copy of the document, it probably would be exempt from disclosure under RCW 42.17.310(1)(h) which exempts 'valuable formulae, designs, drawings, and research data obtained by any agency . . . when disclosure would produce private gain and public loss.' "

RCW 42.17.020(36) (emphasis added). A document is a public record if it is (1) a writing (2) containing information relating to the conduct of government or the performance of any governmental or proprietary function (3) prepared, owned, used, or retained by any state or local agency regardless of the physical form or characteristics. *Oliver v. Harborview Med. Ctr.*, 94 Wn.2d 559, 565, 618 P.2d 76, 26 A.L.R.4TH 692 (1980); RCW 42.17.020(36).

Factors (1) and (2) above are undisputed. IPS-10380 is apparently a written document, and the design and construction of a public power plant is a governmental function of the District. Factor (3), however, is in contention.

CRA contends that it established factor (3) by showing that the District "used" the document for a governmental purpose. CRA further contends that the "public record" definition does not require that the District prepare, own, obtain, or retain the document in addition to using it. Specifically, CRA claims that the District "used" IPS-10380 by (1) reviewing and evaluating it as part of assessing Cogentrix's bid, (2) incorporating it by reference in the Development Agreement with Cogentrix, and (3) relying upon it in representations to other agencies.

As evidence of use number one, CRA points to Sanders' deposition testimony describing the passing of documents at Cogentrix's headquarters in the fall of 1994. As evidence of use number two, CRA points to the statement in Exhibit A to the final development agreement. It states that the Project's combustion turbine "is more fully defined in General Electric quotation IPS-10380 dated April, 1994." For evidence of use number three, CRA points to the reference to IPS-10380 in the District's July 17, 1995, letter to the Council, and in the District's Environmental Impact Statement that spoke to the environmental effects of the General Electric Model MS7231FA turbine generator.

The District's response appears to be twofold. First, it asserts that "use" in the context of the public records definition requires the agency (1) to obtain the document *and*

(2) to apply it to a governmental purpose. It also claims that the facts here do not demonstrate "use." We find the second argument persuasive.

■ Although the Act requires disclosure of a document that an agency has used, we find no Washington case discussing the parameters of the word "use." *See, e.g., Limstrom v. Ladenburg,* 85 Wn. App. 524, 529, 933 P.2d 1055, *review granted,* 133 Wn.2d 1001 (1997) (prosecutor's criminal case files are public records because they are *"used* by the prosecutor's office in carrying out [its prosecutorial] functions"). Thus, we first must determine the word's meaning in the context of the Public Disclosure Act; we do so by applying general principles of statutory construction. *Harmon v. Department of Soc. & Health Servs.,* 134 Wn.2d 523, 530, 951 P.2d 770 (1998).

■ Principles of statutory construction begin with the premise that if a statute is plain and unambiguous, it is not subject to judicial interpretation. *Harmon,* 134 Wn.2d at 530; *State v. Bourne,* 90 Wn. App. 963, 969, 954 P.2d 366 (1998). A statute which, according to its natural and ordinary sense and meaning, is capable of being well understood is plain and unambiguous. *Bourne,* 90 Wn. App. at 969.

The word "used" as contained in the statutory definition of public records is capable of being well understood according to its natural and ordinary meaning. RCW 42.17.020(36). Thus, judicial interpretation is not necessary.

■■ A document relating to a governmental function is "used" by the agency if it is applied to a given purpose or instrumental to an end or process. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2523 (1969) and BLACK'S LAW DICTIONARY 1541 (6th ed. 1990) (defining "use" as employing for or applying to a given purpose or making instrumental to an end or process). Thus, an agency may have used a document not in its possession, but, under the circumstances here, evidence that the District merely reviewed,

evaluated, or referred to the document is insufficient to establish "use."

Here, the District asserts that the final specifications for the turbine actually used in the Project do not incorporate IPS-10380. The preponderance of the evidence supports this assertion. Further, CRA has not produced any evidence refuting this contention or shown that the District, in any other way, applied IPS-10380 for a purpose or made it instrumental to a particular end or process.

CRA's evidence that District agents (1) saw the document at Cogentrix's headquarters; (2) mentioned the document in the development agreement; and (3) referred to it in a letter to the Council does not by itself prove use and is insufficient to overcome the District's evidence of nonuse.[5] Thus, we conclude that the District has presented sufficient evidence to establish that IPS-10380 is not a public record. Accordingly, the trial court did not err by refusing to order disclosure. *Amren*, 131 Wn.2d at 32; *Tacoma News*, 55 Wn. App. at 519; RCW 42.17.340(1).

B. Financial Records

CRA contends that the District failed to disclose detailed information justifying its $14,710,970 "estimate" for the cost of transmission line upgrades. The following additional background information is relevant to this issue.

In October 1994, the District provided Wachter a "Financial Inputs and Assumptions" statement indicating a projected cost for transmission upgrades of $14,710,970. In April 1995, Wachter requested from the District a "cost detail" for these "Transmission upgrades." In May, the District responded:

The information you requested is not currently available. We are presently evaluating a number of different possibilities

---

[5]On the other hand, the District's assertions that IPS-10380 was "solely in the possession of a private corporation," that the performance-based nature of the contract made the technical information unimportant to the District, and that General Electric was claiming that the specifications are "confidential and proprietary" are not necessarily inconsistent with the document's claimed status as a public record.

for transmission upgrade options prior to finalizing our plans. When the planning is completed and specific transmission plans are adopted, we will be able to provide the information you requested. The $14,710,970 is our best estimate of the cost of these upgrades.

In August 1995, Wachter repeated his request for a breakdown of the total estimated cost of the Project and provided the District a sample cost breakdown summary. The District's response included an itemized list of the various transmission lines and switching stations to be added and/or upgraded and a total estimated cost for the entire list.

After further communications, Wachter and Hall visited the District in March 1996, where, according to Sanders' affidavit, the District "made available . . . all materials in the possession of the utility with regards to the River Road Generating project." Mick Shutt, the District's public relations manager, provided a similar affidavit. And Wayne Nelson, in his affidavit, states that

Mr. Wachter and Mr. Emmory Hall were provided access to all documents in the Utility's possession regarding the costs of the generation facility. At one point in time Mr. Wachter did request that the costs be kept and provided in a particular format. The utility was not interested in following Mr. Wachter's suggestion of record keeping but has not refused Mr. Wachter access to any documents which would include the information he requested. In fact, the documentation the utility had covering those requests were contained in the documents made available to Mr. Wachter and Mr. Hall when they came and perused all the Utility documents.

We reject the District's first contention—that CRA abandoned its request for financial information about the project. CRA's complaint alleges that the District "has been reluctant to reveal complete budgeting details on the 160.85 million dollar generating plant project." Its prayer for relief requests an order requiring the District to provide all "cost records" involving the Project. And its memorandum in

support of records disclosure, dated August 1996, asks for "other documents promised by the District but not delivered" and then cites its prayer for relief in the complaint.

When the trial court did not refer to the financial documents in its written opinion, the CRA sought a resolution of this issue in subsequent memoranda. Further, the trial court stated at the compliance hearing that the District has "a duty to provide, *as has been indicated, all* budget and financial records." (Emphasis added.) Thus, we conclude that CRA never abandoned its request for a cost breakdown for the Project.

■ But we agree with the District's contention that the trial court's "finding in favor of the [District] on this point is supported by substantial evidence." When the record on appeal consists only of affidavits, memoranda of law, and other documentary evidence, as it does here, we review the record de novo. *Amren*, 131 Wn.2d 32; *PAWS*, 125 Wn.2d at 252. We find no evidence in the record identifying an existing document that the District failed to disclose. Although the District said it would provide a cost breakdown for the transmission upgrades, there is no evidence that it ever prepared such a breakdown. Thus, the trial court did not err in dismissing the suit.

## ATTORNEY FEES

■ CRA requests the attorney fees and costs it incurred before the trial court and on appeal and statutory penalties pursuant to RCW 42.17.340(4). But because the CRA failed to establish a violation of the Public Disclosure Act, we must deny its request. RCW 42.17.340(4). *Amren*, 131 Wn.2d at 36-37 (penalties warranted when an agency erroneously denies a public record and a party prevails against the agency in obtaining a copy).

We affirm.

MORGAN and HUNT, JJ., concur.

Review granted at 137 Wn.2d 1013 (1999).